1   **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8

9   United States of America,                    No. CR-24-03268-001-TUC-SHR (LCK)

10                Plaintiff,                         **REPORT AND**
                                                     **RECOMMENDATION**
11  v.

12  Darwin Rita-Luna,

13                Defendant.

14

15          Defendant Darwin Rita-Luna is charged with illegal reentry of a removed alien in

16  violation of 8 U.S.C. § 1326. He moves to dismiss his charge on the ground that it is based

17  on an invalid order of removal. The Court will recommend that his motion be denied.

18                                    **Background**

19          Defendant, a native and citizen of Mexico, first entered the United States in 2008,

20  when he was 17 years old. (Doc. 46 at 6–7, 14.) He lived in Tennessee with his uncle until

21  October 2010, when he briefly returned to Mexico to visit his ailing mother. (*Id.* at 14–16.)

22  In January 2011, he was apprehended by United States Border Patrol agents after crossing

23  back illegally into Arizona. (*Id.* at 20–21.) He was placed in expedited removal proceedings

24  and then deported to Mexico. (Pl.'s Ex. 3.)

25          Defendant has been deported from the United States several times since then, each

26  time based on the 2011 order of removal. (Doc. 46 at 42–44.) He was apprehended in

27  Arizona again in May 2024 and later indicted for illegal reentry. (Docs. 1, 8.) He filed a

28  motion to dismiss, arguing that the 2011 removal order is constitutionally deficient and

1  thus cannot serve as a predicate for his reentry charge. (Doc. 19.) The matter was set for

2  an evidentiary hearing. (Docs. 30, 31, 38.)

3       At the hearing, the Government presented the testimony of Border Patrol Agent

4  Nestor Espino, the agent who conducted Defendant's expedited removal proceeding. Agent

5  Espino did not recall his interaction with Defendant, so he testified about his routine

6  practices for such proceedings. (Doc. 36 at 15.) He testified that he obtains an alien's

7  biographical information and fingerprints to determine whether the alien is already subject

8  to an order of removal; if not, then he conducts an expedited removal. (*Id.* at 19.) He stated

9  that he conducts the proceeding in the language specified in the forms, translates all

10 information in each form, records the alien's answers to questions verbatim, translates the

11 answers back, gets supervisory approval, and gives the alien copies of the completed forms.

12 (Doc. 36 at 26–42, 44–47; Doc. 37 at 10–13, 24–25, 37–38, 77.)

13      Defendant testified at the hearing on his own behalf. He stated that Agent Espino

14 asked him "simple" questions about his background, told him that he would be deported

15 for five years, and directed him to sign certain forms. (Doc. 46 at 22, 28, 45.) However, he

16 testified that Agent Espino never translated the forms, never read his answers back to him,

17 and failed to give him copies of the forms. (*Id.* at 26–36.) He also testified that he was

18 never given the opportunity to explain that the reason he left Mexico was to escape his

19 physically abusive stepfather. (*Id.* at 33.) He says that his entire encounter with Agent

20 Espino lasted no more than two to three minutes. (*Id.* at 22–23.)

**Discussion**

21      "A noncitizen charged with being a previously removed alien found in the United

22 States under § 1326 has a Fifth Amendment right to collaterally attack the underlying

23 removal order." *United States v. Orozco-Orozco*, 94 F.4th 1118, 1122 (9th Cir. 2024)

24 (citing *United States v. Alvarado-Pineda*, 774 F.3d 1198, 1201 (9th Cir. 2014)). To

25 succeed, the alien must show that he "exhausted any administrative remedies that may have

26 been available to seek relief against the order"; that "the deportation proceedings at which

27 the order was issued improperly deprived [him] of the opportunity for judicial review"; and

- 2 -

that "the entry of the order was fundamentally unfair." 8 U.S.C. § 1326(d).

The first and second requirements are satisfied in this case because administrative exhaustion and judicial review are not available in expedited removal proceedings. *United States v. Gambino-Ruiz*, 91 F.4th 981, 985 (9th Cir. 2024). So, the success of Defendant's challenge turns on whether the 2011 removal order was fundamentally unfair. A removal order is "'fundamentally unfair' if (1) a defendant's due process rights were violated by defects in his underlying deportation proceeding, and (2) he suffered prejudice as a result of the defects." *United States v. Valdivias-Soto*, 112 F.4th 713, 722 (9th Cir. 2024) (quoting *Alvarado-Pineda*, 774 F.3d at 1201). As discussed below, Defendant has made neither showing here.

## I.    Defendant has not met his burden to establish a due process violation.

The procedures for expedited removal proceedings are set forth in 8 U.S.C. § 1225 and 8 C.F.R. § 235.3. The statute authorizes immigration officers to make inadmissibility determinations and enter removal orders, generally "without further hearing or review," 8 U.S.C. § 1225(b)(1)(A)(i), and the regulation imposes specific duties on immigration officers during that process, 8 C.F.R. § 235.3(b)(2)(i). Defendant argues that Agent Espino violated the regulation in several ways, and that the violations rise to the level of a due process violation. The Government agrees that there was at least one regulatory violation, but it asserts that Agent Espino complied with the regulation in all other respects. It further asserts that any regulatory violations do not rise to the level of a due process violation.

The Court finds that Agent Espino violated the regulation in at least two ways, but that Defendant nevertheless received due process. These findings are explained below. It is necessary, however, to begin with a critical threshold issue: the credibility of Defendant and Agent Espino. As noted, Defendant testified that he saw Agent Espino for only two to three minutes. Defendant testified that, during that brief period, Agent Espino asked him several "simple" questions, told him that he would be deported for five years, and had him sign certain forms. Defendant says that Agent Espino never translated the forms, never read his answers back to him, and never told him what he was signing. This testimony conflicts

with that of Agent Espino. While he does not recall Defendant, he testified that he always translates the forms, asks all questions listed on the forms, records the alien's answers verbatim, reads the answers to the alien before completing the forms, gets supervisory approval, and serves the alien with copies of the completed forms.

Based on its observations of the witnesses and review of the testimony and other evidence, the Court finds that Defendant's testimony is, in large part, not credible. Defendant plainly has a motive for misrepresenting what occurred. There is also reason to question his memory, as his removal proceeding occurred 14 years ago, he has been removed several times since then, and he conceded that he did not remember all the details. (Doc. 46 at 44, 63.) These factors manifested in his testimony. For example, he avoided answering straightforward questions about whether a certain form was filled out at the time he signed it. (*Id.* at 67–68.) Further, on direct examination, he was clear that he could not recall whether he was asked if he was fearful of being returned to Mexico. (*Id.* at 32.) On cross-examination, however, he stated that he was asked that question. (*Id.* at 44.) When the Government pressed him on that inconsistency, he then insisted that he was *not* asked that question—even though he initially testified that he could not recall. (*Id.* at 45–46, 71.)

Defendant's testimony also lacks overall plausibility. For instance, he recalled being asked nine of the questions on Form I-867A, and he agreed that Agent Espino recorded his answers correctly. (*Id.* at 63–65.) But he denied that Agent Espino asked him the credible-fear questions on Form I-867B. (*Id.* at 45–46.) It simply is not believable that Agent Espino would ask all the questions on Form I-867A, record Defendant's answers to them accurately, and then make up Defendant's answers to the questions on Form I-867B. And given that Defendant recalls being fingerprinted, photographed, and questioned by Agent Espino, it is not believable that their interaction lasted three minutes. (*Id.* at 22, 63–65.)

The lack of plausibility is further evidenced by Defendant's testimony that he never had the chance to tell Agent Espino about his violent stepfather. (*Id.* at 33, 71.) He says that he was not asked if he had a fear of being returned to Mexico, and that he would have told Agent Espino about his stepfather if he had been asked. (*Id.* at 33.) However, he

- 4 -

recalled Agent Espino asking him why he had come to the United States. (*Id.* at 36.) That question is different than "do you fear being returned to your home country," but it invites a similar answer for a person who does have such fear (e.g., "I came here to escape my abusive stepfather."). So, even accepting Defendant's testimony that he was not asked the credible-fear question (and the Court does not), he still had an opportunity to tell Agent Espino about his stepfather. His assertion that he did not raises doubts about the reliability of the rest of his testimony. Furthermore, that Defendant did not mention his stepfather when asked why he had come to the United States—he instead answered "to live and work"—undermines his testimony about the severity of his situation in Mexico. (*Id.* at 65.)

Agent Espino's testimony also had its issues. For example, he appeared to be unsure about certain aspects of the law (e.g., he initially indicated that an alien who crosses in the desert is not considered an applicant for admission). (Doc. 36 at 82–83.) However, he was clear and consistent that when he conducts expedited removal proceedings, he translates all the forms, asks all the listed questions, reads the alien his answers, gets supervisory approval, and serves copies of the completed forms. This key testimony is corroborated by the forms, all of which are filled out in their entirety (although, as discussed below, there are technical violations as to two of the forms). For instance, the presence of other agents' signatures on the forms corroborates Agent Espino's testimony about multi-level review of expedited removals (and such review makes it less likely that Defendant's rights were violated in the way he alleges). The testimony is further corroborated by Defendant's agreement that Agent Espino asked the questions on Form I-867A and accurately recorded his answers. This suggests that Agent Espino conducted other parts of the removal proceeding correctly as well. Thus, the Court finds that Agent Espino likely followed his routine practice in Defendant's case.

The Court now turns to Defendant's allegations of error. The first set of alleged errors pertain to Defendant's sworn statement. The regulation requires the immigration officer to "create a record of the facts of the case and statements made by the alien." 8 C.F.R. § 235.3(b)(2)(i). This requires reading to the alien all information contained on

Form I-867A; questioning the alien about his identity, alienage, and inadmissibility; recording the alien's answers on Forms I-867A and I-867B; reading to the alien his sworn statement; and having the alien sign and initial each page of the statement. *Id.* The fourth regulatory requirement—to read the sworn statement back to the alien—is also required by due process. *United States v. Raya-Vaca*, 771 F.3d 1195, 1204 (9th Cir. 2014), *abrogated on other grounds by Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103 (2020).

Defendant testified that Agent Espino did not read him the advisements on Forms I-867A and I-867B, ask him the questions on Form I-867B, or read him his sworn statement so that he could verify its accuracy. (Doc. 46 at 26–33.) For the reasons discussed above, this testimony is not credible. The Court finds that Agent Espino followed his practice of translating all the forms, asking all listed questions, and reading the alien's answers back before completing the forms. (Doc. 36 at 28–32, 37–39; Doc. 37 at 10, 24–25, 37–38.)

Resisting this conclusion, Defendant points out that Agent Espino was apparently unaware that an alien who crosses in the desert is considered an applicant for admission. (Doc. 36 at 82–83.) That information is on Form I-867A, and Defendant argues that Agent Espino's unfamiliarity with it shows that he did not read that form as part of his normal practice. (Doc. 53 at 50.) However, Agent Espino has not conducted an expedited removal proceeding in "several years." (Doc. 37 at 11.) He agreed that he would have known the form's language "like the back of [his] hand" in 2011, but he refused to agree with defense counsel that he knows it now. (*Id.*)

Defendant also says that Agent Espino simply could not have read all the forms to every alien, as he testified that he processed between 30 to 50 aliens every two hours and that between 700 to 900 aliens were processed per day. (Doc. 53 at 50–51; Doc. 59 at 4–5.) This argument is not persuasive. Agent Espino testified that, on any given day, there were between 700 to 1,000 aliens *detained* and up to 30 agents assigned to processing. (Doc. 36 at 63–64.) Defense counsel later misstated this testimony, asking Agent Espino: "And because there are anywhere between approximately 700 and a thousand aliens who are being *processed* on a given day, during that time, there's a lot of individuals to be

processed; correct?" (*Id.* at 67 (emphasis added).) Agent Espino answered "[y]es." (*Id.*) But the question was imprecise—it ended with a general inquiry about "a lot" of aliens needing to be processed—and, in the flow of the exchange, the Court understood Agent Espino to be answering that general question. Counsel later asked: "And then with 700 to a thousand on any given day, it can take hours if not more than a day to get to the—every individual who's been brought in on any particular day; correct?" (*Id.* at 68.) Agent Espino answered, "[i]t could take time, yes." (*Id.*) This question also was imprecise. It did not ask whether 700 to 1,000 aliens were processed per day; it simply noted that that many aliens were in custody on any given day. Further, the question expressly contemplated that it would take "more than a day" to process every alien arrested. Indeed, Agent Espino later made clear that "not all those 700, 800 [aliens] get processed the same day." (*Id.* at 74.) There is no inconsistency here.

Defendant also asserts that Agent Espino "agreed" that he processed "30, 40, 50" aliens every "couple" of hours. (Doc. 36 at 68; Doc. 59 at 5.) However, counsel had just finished asking questions about the total number of aliens in custody (700 to 1,000). (Doc. 36 at 68.) In the context of the exchange, the Court understood Agent Espino to be referring not just to himself but to other agents assigned to processing as well. This conclusion is supported by Agent Espino's clarification that only a fraction of the number in custody would be processed on any given day. (*Id.* at 74–75.) Defendant argues that Agent Espino "change[d] his testimony" because he caught on to "where the questioning was going," but the Court sees it as a simple clarification. (Doc. 59 at 5.)

As to the next alleged error, Defendant points out that Agent Espino did not obtain his signature or initials on each page of Form I-867A. (*See* Pl.'s Ex. 1.) The Court agrees that this was a violation of the regulation. The regulation is clear that the "sworn statement" is comprised of *both* Forms I-867A *and* I-867B. *See* 8 C.F.R. § 235.3(b)(2)(i) ("This shall be accomplished by means of a sworn statement using Form I-867AB[.]"). This is also clear from the forms' titles ("Record of Sworn Statement" and "Jurat for Record of Sworn Statement"), numbering ("867A" and "867B"), and content. (Pl.'s Exs. 1, 2.) As such,

- 7 -

1    Agent Espino was required to obtain Defendant's signature not only on Form I-867B but

2    also on each page of Form I-867A. The absence of Defendant's signature on the latter is a

3    regulatory violation.

4        The Government disagrees, arguing that the alien need only sign Form I-867B. In

5    support of its position, it points out that Form I-867B has a signature line for the alien and

6    Form I-867A does not. (Doc. 53 at 32–35.) This is not persuasive evidence. As discussed

7    below, the Government concedes that Agent Espino violated the regulation by not having

8    Defendant sign Form I-860. That form does not have a signature line for the alien either,

9    yet the absence of Defendant's signature is still a violation. What this shows is that the

10   immigration forms are imperfect. It does not show that the regulation requires only a single

11   signature on Form I-867B—contrary to its express requirement that the alien "sign and

12   initial *each page* of the statement and each correction." 8 C.F.R. § 235.3(b)(2)(i) (emphasis

13   added).

14       That said, the Court disagrees with Defendant that the absence of his signature and

15   initials on Form I-867A is a due process violation. A violation of a regulation violates due

16   process when the regulation protects a person's right to "notice and an opportunity to

17   respond," i.e., the "fundamental due process rights." *Raya-Vaca*, 771 F.3d at 1204. The

18   signature requirement does not directly protect those rights, and it is easy to conceive of a

19   scenario in which an alien receives due process without signing the form (e.g., the alien

20   simply refuses to sign). Indeed, the Ninth Circuit Court of Appeals has held (albeit in an

21   unpublished decision) that the failure to obtain a signature on each page of Form I-867A

22   does not, by itself, violate due process. *United States v. Mazariegos-Mazariegos*,

23   No. 20-10316, 2022 WL 832071, at *2 (9th Cir. 2022) ("The fact that Agent Trujillo failed

24   to obtain Mazariegos' signature on every page of Forms I-867 and I-860 does not amount

25   to a due process violation."). Defendant's contrary authority, including a large number of

26   out-of-district trial-court decisions, is neither binding nor persuasive on this point.

27       The second set of alleged errors pertain to Form I-860, the Notice and Order of

28   Expedited Removal. The regulation requires that the immigration officer advise the alien

- 8 -

of the charge against him using Form I-860; serve the alien with that form after receiving supervisory approval; and have the alien sign the form on the reverse side to acknowledge receipt. 8 C.F.R. § 235.3(b)(2)(i). The first regulatory requirement—to advise of the charge of inadmissibility—is also a due process requirement. *Raya-Vaca*, 771 F.3d at 1204.

Defendant asserts that Agent Espino failed to read him the charge and failed to serve him with Form I-860 after obtaining supervisory approval. (Doc. 46 at 34–36; Doc. 53 at 13–15.) However, Defendant's own testimony indicates that he was advised of the charge. He testified that Agent Espino asked him if he had a valid entry document, to which he answered no, and that Agent Espino advised him that he would be deported for five years because he "had entered illegally." (Doc. 46 at 38, 63.) This corresponds directly to the charge against Defendant: "You did not then possess or present a valid immigrant visa, reentry permit, border crossing identification card, or other valid entry document, to wit, you have entered into the United States illegally with the intent to reside in the United States." (Pl.'s Ex. 3.)

Furthermore, Agent Espino testified that his routine practice is to translate and serve the form, and that his signature on the form is confirmation that he did so in this case. (Doc. 36 at 40–42.) The Court finds this testimony credible, and Defendant's attempts to cast doubt on it are not persuasive. As noted, the regulation requires that the immigration officer serve the form *after* obtaining supervisory approval. Defendant asserts that Agent Espino admitted that he has no further contact with the alien after obtaining supervisory approval. Therefore, Defendant says, Agent Espino could not have completed service *after* obtaining supervisory approval. (Doc. 53 at 13–15.) However, the Court does not agree with this interpretation of the testimony. Agent Espino stated that there is no need to contact the alien again "if his file is processed and complete." (Doc. 36 at 76.) This indicates that he understood the question to refer to a point in time after all the forms had been completed and served. Defense counsel did not specifically ask Agent Espino when he serves Form I-860, and the Court does not read his testimony as an admission to a regulatory violation.

Defendant also asserts that Agent Espino "contradicted himself" when testifying

about Form I-860. (Doc. 53 at 15.) He says that "Agent Espino did summersaults to avoid admitting that he did not obtain [Defendant's] signature on the 860 or on the reverse side, when its absence could not be contested." (Doc. 36 at 44–45; Doc. 37 at 15; Doc. 53 at 15; Doc. 59 at 5.) The Court disagrees. Agent Espino's initial testimony was specifically about the Form I-860 in Defendant's case. He stated correctly that, as it appears in the record, the form does not have a second page or reverse side. (*See* Pl.'s Ex. 3.) His later testimony was about how the computer system had been updated to generate a second page for the alien to sign. He was "not sure," however, if that update had occurred (and thus the second page would have been printed) at the time of Defendant's removal proceeding. (Doc. 37 at 15.) This testimony is not contradictory.

As to the final alleged violation, Defendant points out that Agent Espino failed to obtain his signature on Form I-860. (Doc. 46 at 34; Doc. 53 at 15.) This is indeed a regulatory violation, and the Government does not contend otherwise. However, so long as the alien receives actual notice of the charge against him, this technical violation does not rise to the level of a due process violation. *See United States v. Ornelas-Dominguez*, No. 19-50333, 2021 WL 3039420, at *1 (9th Cir. 2021) (holding that the lack of a signature on Form I-860 did not violate due process because the evidence showed "the immigration officer informed Ornelas-Dominguez of the charges of removability and that Ornelas-Dominguez received notice of those charges"). Defendant's testimony, Agent Espino's testimony, and the forms indicate that Defendant received notice here. Defendant has not convinced the Court otherwise.

\* \* \*

Defendant has not met his burden to establish a due process violation.

## II.    Defendant has not met his burden to establish prejudice.

To establish prejudice, Defendant must show that he had "plausible grounds for relief from removal in the form of withdrawal of his application for admission." *Raya-Vaca*, 771 F.3d at 1206. If granted, this discretionary form of relief would have allowed Defendant to "exit the United States voluntarily and without a removal order." *Id.*

In determining whether such relief was plausible, the Court looks to the Inspector's Field Manual. *Id.* The Manual directs "officers to consider all relevant facts and circumstances," including: "(1) the seriousness of the immigration violation; (2) previous findings of inadmissibility against the alien; (3) intent on the part of the alien to violate the law; (4) ability to easily overcome the ground of inadmissibility; (5) age or poor health of the alien; and (6) other humanitarian or public interest considerations." *United States v. Flores*, 901 F.3d 1150, 1162 (9th Cir. 2018) (first quoting *Raya-Vaca*, 771 F.3d at 1207; and then quoting *United States v. Barajas-Alvarado*, 655 F.3d 1077, 1090 (9th Cir. 2011)).

The first factor weighs marginally against Defendant, as his prior illegal entry and voluntary departure make his second entry somewhat more serious. The third factor weighs against Defendant, as crossing through the desert rather than at a port of entry shows that he intended to violate the law. *See Raya-Vaca*, 771 F.3d at 1208 (weighing the first and third factors against the alien because of prior entries, including entries outside a designated port of entry). The fourth factor weighs against Defendant, as he has not offered anything to suggest that he could have easily overcome his ground of inadmissibility. His uncle's temporary status in the United States does not appear to have given him a path to legal status. *Cf. id.* (noting that the alien "may have had a relatively straightforward path to legal status" based on his partner's and brother's citizenship); *see* 8 C.F.R. § 204.2 (authorizing petitions for certain immediate relatives, not including uncles or aunts). The fifth factor weighs against Defendant because he was an adult, albeit only 19 years old, and there is no evidence that he was in poor health at the time. Defendant's attempt to collapse the fifth factor's inquiry into the sixth's is not persuasive. (*See* Doc. 19 at 19.)

As to the sixth factor, Defendant argues that the "humanitarian concern and public interest in providing safe homes for teenagers, particularly where they are victimized by repetitive and drunken physical violence, along with the interest in family unification in such circumstances, weighs strongly in [his] favor." (*Id.*) This may be true as a general proposition, but Defendant's testimony on this issue is not credible. He had the opportunity to tell Agent Espino about his abusive stepfather. Instead, he denied any fear of harm in

Mexico and stated simply that he wanted to live and work in the United States. That evidence severely undermines his claim that he was in such danger that he needed to flee to his only relative in the United States. Furthermore, as to the interest in family unification, Defendant's familial ties to the United States are far less significant than those that have been found relevant in these types of cases. *Cf. Raya-Vaca*, 771 F.3d at 1208 (noting that the alien's spouse, children, mother, siblings, and extended family all lived in the United States). Thus, the Court finds that the humanitarian and public interest factor does not support Defendant.

Of the enumerated factors, only the second supports Defendant. Defendant had a prior voluntary return, but there is no evidence that he had an official finding of inadmissibility. At least one non-enumerated factor—lack of criminal history—supports him as well. *See id.* at 1209 (finding that the alien's minimal criminal history weighed in favor of relief).

Defendant also attempts to rely on statistical evidence described in *Raya-Vaca*. That evidence showed that, in 2004, about 70% of aliens who were placed in expedited removal proceedings were allowed to withdraw their applications for admission, and that that number was about 44% in 2008. *Id.* The Ninth Circuit found that such data provided "relevant context for the frequency with which withdrawal was permitted and, when considered in conjunction with other individualized evidence supporting the plausibility of relief, cut[] in [the alien's] favor." *Id.* These statistics offer minimal support to Defendant, because he lacks the "other individualized evidence supporting the plausibility of relief" that was present in *Raya-Vaca*, namely, the "significant humanitarian considerations" and a "relatively straightforward path to legal status." *Id.* at 1208–09.

Agent Espino testified that there was a surge of illegal crossings at the time of Defendant's removal, and that agents were subject to a directive to not grant relief in the form of withdrawal of application. (Doc. 36 at 76–78; Doc. 37 at 81–82.) Defendant argues that there is good reason to reject this testimony, including that he was granted voluntary departure in April 2011, only a few months later. (Doc. 53 at 12; Doc. 46 at 43.) The Court

agrees that Defendant's later voluntary departure undermines the notion that agents were precluded from granting relief. Still, even if relief was not precluded, Agent Espino's testimony certainly indicates that relief was less likely to be granted. The Inspector's Field Manual provides that "workload" can be a "less significant" factor in determining whether to grant relief. (Def.'s Ex. 30 at 1.) Agent Espino's testimony about agents' response to their increased workload shows that relief was less likely for Defendant.

Weighing in Defendant's favor are his lack of prior inadmissibility findings, lack of criminal history, and statistical evidence. Several other factors weigh against him or are neutral. Although a review of the caselaw shows that Defendant's burden is not especially high, on this record, the Court concludes that Defendant has not demonstrated more than a "'theoretical[]' possibility of relief." *Raya-Vaca*, 771 F.3d at 1207 (alteration in original) (quoting *United States v. Reyes-Bonilla*, 671 F.3d 1036, 1050 (9th Cir. 2012)). As such, even if there were a due process violation, he has failed to meet his burden to establish prejudice.

### Conclusion

Defendant has not met his burden to show that his final order of expedited removal was fundamentally unfair. Therefore, the Court recommends that his motion to dismiss the indictment (Doc. 19) be **denied**.

This recommendation is not immediately appealable to the United States Court of Appeals for the Ninth Circuit. The parties have 14 days to file specific written objections with the district court. Fed. R. Crim. P. 59(b)(2). The parties have 14 days to respond to objections. The parties may not file replies on objections absent the district court's permission. A failure to file timely objections may result in the waiver of de novo review. *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).

Dated this 8th day of April, 2025.

Honorable Maria S. Aguilera
United States Magistrate Judge

- 13 -